IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DENISE HEMPHILL, )<br>)<br>Claimant, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, Acting )<br>Commissioner of Social Security,[1] )<br>)<br>Defendant. )<br>) | No. 14 C 3450<br><br>Magistrate Judge<br>Michael T. Mason |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Denise Hemphill ("Hemphill" or "Claimant") brings this motion for summary judgment under 42 U.S.C. § 405(g). Claimant seeks review of the final decision of the Commissioner of Social Security ("Commissioner"), denying Hemphill's claims for Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"), 42 U.S.C §§ 416(i) and 423(d), and Supplemental Security Income ("SSI"), 42 U.S.C. § 1382a(a)(3)(A). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Claimant's motion for summary judgment [17] is granted and the Commissioner's cross-motion for summary judgment [19] is denied.

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).

## BACKGROUND

## I. PROCEDURAL HISTORY

On February 18, 2011, Hemphill filed a claim for DIB and SSI, alleging disability since June 1, 1991, due to chronic pain syndrome, bilateral knee osteoarthritis, bilateral hip pain, left arm pain, back pain, depression, and learning disorder. (R. 15.) The claim was denied initially on May 26, 2011, and upon reconsideration on September 21, 2011; after which, she timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 21, 2012. Hemphill personally appeared and testified at the hearing and was represented by counsel. Medical expert Dr. David Biscardi also testified. The hearing was continued for further development of the record.

On January 9, 2013, a second administrative hearing was held before ALJ B. Carlton Bailey, Jr. Hemphill personally appeared and testified at the hearing and was represented by counsel. Medical expert Dr. Hilda Klein and vocational expert Lisa Gagliano also testified. On March 7, 2013, the ALJ denied Hemphill's claims for both DIB and SSI, finding her not disabled under the Act. The Social Security Administration ("SSA") Appeals Council then denied Hemphill's request for review on March 24, 2014, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. FACTUAL BACKGROUND

### A. Background

Claimant was born on September 23, 1965, and was forty-seven years old at the time of the ALJ hearing. (R. 298.) She was single, had a high school education and

lived alone. (R. 43, 45.) Claimant had two adult children that did not live with her. (R. 43-44.) In 1991, Claimant was injured in a motor vehicle accident. (R. 451.) She suffered right leg and left arm fractures that required surgery, and a crushed pelvis. (*Id.*) After the accident, she became dependent upon cocaine and heroin to "numb the pain," until she went to prison in 2007. (*Id.*) Following her release from prison in 2010, as part of the requirements for living at Grace House, a halfway house, she held a part-time job at McDonald's until May 2012. (R. 47, 68, 637.)

### B. Medical Evidence

#### 1. Physical Health Treatment Records

Claimant received most of her care from nurse practitioners at the Heartland Health Center – Uptown ("Heartland") from December 2010 through October 2012. (R. 499, 793.) On December 9, 2010, Claimant visited Heartland and was examined by Nurse Practitioner Teresa Savino. (R. 499.) Claimant complained of chronic pain in her right lower leg, pelvis, and left arm. (*Id.*) She indicated that her leg hurt most when she stood for too long and that she experienced the pain since the 1991 car accident. (*Id.*) It was noted that she previously used drugs, however, she quit while in prison. (R. 500.) She was prescribed Naproxen for her pain and hydrocortisone cream for a rash. (R. 501-02.)

On December 30, 2010, Claimant was examined by Nurse Practitioner Diane Judge. (R. 496.) She complained of right leg pain and requested more Naproxen because her purse had been stolen. (*Id.*) She also requested cough syrup when she saw them in the nurse's supplies. (*Id.*) The notes indicate that her cough was nonproductive and worse at night. (*Id.*) She was advised of Heartland's lost-stolen

3

medication policy and told that her medication would only be replaced once. (R. 498.) On January 27, 2011, Claimant was again examined by Nurse Judge. (R. 480.) She complained of pain in her left forearm, pelvis, and right leg, and requested a brace for her left arm. (*Id.*) She also requested assistance applying for Social Security. (*Id.*) In addition, Claimant asked the same questions over and over. (*Id.*)

Many of Claimant's subsequent visits were routine follow-ups. Claimant's symptoms remained the same or worsened, and she often requested assistance and the completion of SSI, Medicaid, and other various disability forms. (R. 542, 546-47, 556-57, 559, 560, 615, 651, 794.) Claimant often appeared well nourished, well hydrated, and displayed no acute distress. (R. 481-667.) She denied feelings of depression. (R. 747.)

On April 22, 2011, Claimant was examined by Nurse Practitioner Sarah Dickson. (R. 546.) She wanted her papers filled out for public aid, HCG testing, and to reschedule her thyroid testing. (R. 546-47.) She complained of left arm chronic pain that worsened when lifting over five pounds, chronic numbness and tingling, right lower leg pain, and increased pain and stiffness when walking upward. (R. 547.) She reported being able to walk one half block before having pain, and for a period of thirty minutes before having to sit down. (*Id.*) She indicated that the medications were working well for her pain. (*Id.*)

On June 8, 2011, Claimant was examined by Dr. Jean Y. Rim. (R. 530.) She complained of pelvic, leg, and back pain and a rash on her right arm. (R. 531.) She was oriented to time, place, and person. (R. 532.) She did not suffer from depression, anxiety, or agitation and her judgement and insight were intact. (*Id.*) She was prescribed

4

Gabapentin, Naproxen, and Acetaminophen for her pain, Calamine Lotion, and vitamins. (R. 530.)

Claimant returned on June 13, 2011, and was again examined by Nurse Dickson. (R. 527.) She wanted a walking cane because the previous week, her knee gave out and caused her to fall. (*Id.*) She complained of joint pain and stiffness. (R. 528.) She had not been motivated to use the combination of Naproxen, Tylenol, Gabapentin, and Capsaicin because "[she] was tired of taking" all of the pills. (R. 527.) She had no joint swelling; however, she did have increased stiffness when getting up from a seated position. (R. 528.) She was prescribed Amitriptyline for her pain, and her Naproxen prescription was switched to Sulindac. Claimant's Gabapentin medication was discontinued. (R. 529.) Eventually Sulindac was discontinued as well because Claimant reported it did not alleviate her pain. (R. 523). In addition, on June 27, 2011, Celebrex was ordered for Claimant but it too was discontinued because it made her nauseous. (R. 666, 669.)

On September 2, 2011, Claimant saw Nurse Practitioner Colleen M. Ryan. (R. 659.) She requested refills of her medication. (*Id.*) She was oriented to time, place, and person; however, she was a poor historian. (R. 661.) She did not remember getting a recent refill and reported that she was only taking her pills as needed. (R. 660.) She was reminded about her previous lost medication incident. (*Id.*) Nurse Ryan reviewed Heartland's lost/stolen medication policy and proper dosing of prescribed medication; she refused Claimant's refill request. (R. 661.)

Nurse Dickson examined Claimant on September 26, 2011. (R. 655.) She complained of chronic pain in her lower back and left leg that worsened when standing

5

three to four hours per day when she worked at McDonald's. (R. 655-56.) She worked four hour shifts, three days per week and had significant difficulty getting through her shift. (R. 656.) On a follow-up visit, on October 14, 2011, Claimant told Nurse Dickson that she wanted the DHS application filled out again with all "D's so that she could get the medical card." (R. 650-51.) She requested a refill of Naprosyn because the Ultram was not relieving her pain. (R. 651.) She was prescribed Amitriptyline, Naprosyn, Acetaminophen, and Capsaicin for her pain. (R. 652.)

On November 15, 2011, Claimant was examined by Dr. Madhuri Thota. (R. 645.) She complained of continuing pelvic pain and for the first time knee pain. (*Id.*) She had a slow stiff gait and was somewhat bent over when getting up from a seated position. (R. 646.)

She returned on March 13, 2012, and was examined by Nurse Practitioner Julia O. Brennan. (R. 615.) She wanted her prescriptions refilled and forms completed. (*Id.*) She reported that her knee pain had worsened, and reported daily swelling after walking or standing. (R. 616.) She had quit her job because she had difficulty walking and standing. (*Id.*) She walked with a limp. (R. 617.) She denied feelings of depression. (R. 615.) She was oriented to time, place, and person, and her judgment and insight were intact. (R. 617.) Her memory for recent and remote events was also intact and she displayed no anxiety or agitation. (*Id.*) She was directed to follow up with Nurse Dickson for pain management and was encouraged to stretch, wear a knee brace, ice when needed, and to take her medication as prescribed. (R 618.) She was prescribed Capsaicin and Naprosyn for her pain. (*Id.*)

On April 19, 2012, Claimant was examined by Nurse Dickson. (R. 610.) She complained of hip and knee pain. (*Id.*) She requested a left-knee x-ray because she felt there was fluid or something rubbing in it when she walked. (R. 610-11.) On May 1, 2012, Claimant had x-rays on her hip and knee. (R. 765.) The x-rays showed severe, bilateral protrusion acetabuli with associated concentric joint space narrowing and productive changes. (R. 766.) There was small knee joint effusion and diffuse demineralization of the visualized bony structures. (R. 768.) There were also questionable bilateral erosions that raised concern for rheumatoid arthritis with other possibilities, including renal osteomalacia and osteoarthritis. (R. 766.)

On July 6, 2012, Claimant was evaluated by Dr. Mydhili Moorthie at the Mile Square Health Center. (R. 739.) Dr. Moorthie diagnosed chronic pain and chronic drug abuse for seventeen years. (*Id.*) Dr. Moorthie noted that Claimant was disabled due to her physical incapability (using a cane). (*Id.*) Dr. Moorthie also indicated that Claimant was able to function at a level that allows for sustaining basic activities of daily living within the community; however, Claimant's disability substantially impeded her ability to live independently without support. (*Id.*) Dr. Moorthie further indicated that Claimant would be in need of a housing program that could offer her additional supportive services, such as a recovery counselor, case manager, and budget manager. (R. 740.)

Claimant returned to Heartland on July 26, 2012 and saw Nurse Dickson. (R. 747.) She complained of back and joint pain, and worsened stiffness and knee pain. (R. 748.) She felt depressed because of her pain. (R. 750.) She reported feeling down, depressed, or hopeless and had little interest or pleasure in doing things for several

days. (R. 747.) She limped, ambulated with a cane, greatly favored her left leg and had diffuse low back pain with mild palpation. (R. 749.)

On September 25, 2012, Claimant underwent an MRI. (R. 779.) The findings indicated minimal amount of left knee joint effusion. (*Id.*) There were subchondral sclerosis, degenerative cystic changes, marginal osteophytes involving medial tibia plateau, and signs of incidental enchondroma. (*Id.*) There was also truncation of the lateral aspect of the anterior horn of the medial meniscus that reflected a complex tear. (*Id.*) However, the rest of the findings appeared unremarkable. (*Id.*)

On October 1, 2012, Claimant was examined by Nurse Ryan. (R. 793.) She complained of back and leg pain. (*Id.*) She displayed no acute distress and her judgment and insight were intact. (R. 793, 795.) She indicated that she felt depressed and had little interest or pleasure in doing things more than half the days. (R. 793.) Her feelings of depression and minimal motivation continued at an October 29, 2012 follow-up visit. (R. 786.)

On October 4, 2012, Claimant was examined by Dr. Paramvir Singh at the John H. Stroger Jr. Hospital Pain Clinic ("Stroger"). (R. 822.) She was referred there on June 10, 2012. (R. 744.) She complained of constant, non-radiating back and pelvic pain that got better with resting and medication; and knee pain. (*Id.*) Following the appointment, Claimant had bilateral knee injections. (R. 812.) However, at her follow-up visit at Stroger, Claimant reported that the injections did not help. (R. 814.) She reported constant sharp throbbing pain that was worse in the mornings and with walking. (*Id.*) She also complained of low back pain, and an achy sensation radiating to both thighs. (*Id.*)

On December 3, 2012, Claimant underwent an MRI of her spine. (R. 810.) The findings indicated there was normal lumbar lordosis with anatomic alignment of the vertebrae. (*Id.*) However, there was dissociation of the intervertebral discs at the levels of T11/T12 through L2/L3 as well as L4/L5. (*Id.*) Claimant was diagnosed with multilevel degenerative disc disease and mild degenerative facet arthropathy, most prominent in L4/L5. (R. 811.)

## 2. Physical Health Agency Consultants

On May 4, 2011, Claimant was examined by consultative examiner Dr. Liana G. Palacci. (R. 451-54.) Claimant complained of left wrist pain and stiffness. (R. 452.) She indicated the pain was exacerbated by holding coins, turning doorknobs, holding gallons of milk, and heavy lifting. (*Id.*) She also complained of right lower extremity weakness and pain. (*Id.*) Dr. Palacci noted that Claimant had a mildly antalgic gait, grip strength of three out of five in her left hand, decreased range of motion in her left knee, and an inability to make a tight fist. (R. 453.) She had difficulty tying her shoelaces and buttoning her shirt. (*Id.*) She had range of motion pain in her right leg and she refused right ankle, right knee, hip and lumbar range of motion testing due to her pain. (*Id.*) The left ankle was normal and her left knee range of motion was 120/150. (*Id.*) She had a normal range of motion in her cervical spine and her straight leg raise test was negative. (*Id.*) Dr. Palacci also noted that Claimant was disoriented and somewhat sedated. (*Id.*) She thought the year was 2009, and she did not know her current location or her home address. (*Id.*) She was unable to remember or even repeat three items and she could not do simple arithmetic. (*Id.*) Further, she was very soft-spoken and there appeared to be psychomotor retardation. (*Id.*)

On May 25, 2011, Dr. Charles Kenney, a medical consultant, completed a consultative Physical RFC Assessment. (R. 115-17.) Dr. Kenney determined that Claimant could occasionally lift twenty pounds, frequently lift ten pounds, and sit, stand, and/or walk for a total of six hours in an eight hour workday (R. 115.) She could push and/or pull without limitation. (R. 116.) She had mild to moderate problems using her left hand with diminished grip at three out of five, and her right hand was within normal limits. (*Id.*) Dr. Kenney determined that Claimant had postural limitations of occasionally balancing, kneeling, crouching, and crawling; no climbing ladders, ropes, or scaffolds, and manipulative limitations of left hand fingering and handling. (R. 116-17.)

Medical consultant Dr. James Madison completed a consultative Physical RFC Assessment on September 20, 2011. (R. 597-604.) The assessment results were virtually the same as Dr. Kenney's May 25, 2011 assessment. (*Id.*) Dr. Madison did note that Claimant "appeared partially credible because she had a history of medically determinable impairments which could result in some limitations. However at the consultative examination she refused to cooperate with some of the exam and reports deficits more limited than medical records and recent exam support." (R. 602.)

### 3. Mental Health Treatment Records

On April 15, 2010 and September 1, 2010, mental health diagnostic and treatment notes were placed in Claimant's prison medical file. (R. 733-34.) The notes indicated that Claimant agreed to attend and was enrolled in Houses of Healing and Anger Management Groups. (*Id.*) She attended, was alert and oriented, and had appropriate affect. (*Id.*) She participated in group discussions and lectures on the value of the topics. (*Id.*) She was also attentive as to how to use the information for current

and future benefit. (*Id.*) It was noted that Claimant would be referred to other groups. (*Id.*)

On November 10, 2010, a mental health diagnostic and treatment note was placed in Claimant's prison medical file. (R. 735.) The note indicated that Claimant was looking forward to going home and being a role model for her children. (*Id.*) She was alert and oriented times four, and her mood was euthymic. (*Id.*) Affect was appropriate and there were no suicidal or homicidal ideations or hallucinations noted. (*Id.*) She had intact judgment and insight and was advised to follow up as needed. *Id.*

On January 6, 2012, Claimant was examined by Dr. Mary Pfeiffer. (R. 634.) Claimant arrived on time and was oriented. (*Id.*) Dr. Pfeiffer noted that Claimant had learned certain coping and life skills to maintain her sobriety. (*Id.*) Dr. Pfeiffer also noted that therapy would be beneficial for Claimant because it would provide structure and help Claimant process the relationship with her children. (*Id.*) Claimant was directed to meet with Dr. Pfeiffer every other week. (*Id.*)

On March 4, 2013, Claimant underwent a psychiatric evaluation at Heartland. (R. 855.) She complained that she was depressed and unable to sleep more than three hours because of her leg pain and the death of her mother. (*Id.*) She could not get out of bed on cold days, did not want to be bothered, and had isolated herself from her family. (*Id.*) She missed her mother and kids, and could not take care of herself. (*Id.*) She felt hopeless, and reported restlessness and panic attacks. (R. 857.) She was anxious, frustrated, sad, and worried. (*Id.*) She had good insight and judgment was lucid. (R. 858.) She was prescribed Trazodone and Bupropion for her depression. (R. 859.)

### 4. Mental Health Agency Consultants

On May 4, 2011, Claimant was examined by clinical psychologist, Dr. Christine C. Kieffer, a consultative psychologist. (R. 448-50.) Dr. Kieffer diagnosed Claimant with major depressive disorder, mild mental retardation, and assigned her a Global Assessment of Functioning ("GAF") score of 30. (R. 450.) Claimant reported the following symptoms of depression: insomnia, poor appetite, social withdrawal, crying jags, and anhedonia. (R. 449.) She denied auditory and visual hallucinations and there was no indication of a psychotic thought process. (*Id.*) Dr. Kieffer noted that Claimant's capacity for attention, concentration, arithmetic calculation, abstract conceptual reasoning, and insight and social judgment were markedly impaired; she had a very poor fund of general information, and was unable to recount any recent news events. (R. 449-50.) She was unable to add, subtract, or multiply, she could not interpret proverbs, and she stated that an apple and banana were similar because "you can eat them." (R. 449.) She also stated that if she found an envelope on the street that was sealed, addressed, and stamped she would "[l]eave it, don't belong to me. [t]hat's stealing." (*Id.*) She would not know what to do if she were the first person to notice a fire in a theater. (*Id.*) Dr. Kieffer determined that she was unable to manage her own funds. (R. 449-50.) Dr. Kieffer also noted that Claimant was oriented to person, but not to place or time and was a poor historian. (R. 449.) Claimant did not understand the purpose of the interview, and gave the date as "the 6th". (*Id.*) Claimant also stated that Bush was the current U.S. President and his immediate predecessor had been Ford; and could only name one U.S. City: Peoria. (*Id.*)

On May 24, 2011, Dr. David Voss, a non-examining reviewer, filled out a Mental RFC Assessment. (R. 117-19.) Dr. Voss noted that Claimant had understanding and

memory limitations, and sustained concentration and persistence limitations. (R. 117-18.) Specifically, she was moderately limited in her abilities to understand, remember, or carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 118.) However, Dr. Voss concluded that Claimant was not significantly limited in her abilities to carry out very short and simple instructions, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavior extremes, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (R. 118-19.) Dr. Voss indicated "while the [C]laimant has a medically determinable impairment that could be expected to cause some limitations in functioning, the [C]laimant's history and evidence in the medical evidence of record does not indicate the presence of functional limitations severe enough to prevent employment in all work environments," and that Claimant was capable of "unskilled work." (R. 119.)

On September 19, 2011, Dr. Lionel Hudspeth, a non-examining consultative psychologist, completed a psychiatric review technique form ("PRTF") and a Mental RFC Assessment. (R. 579-89, 590-92.) On the PRTF, Dr. Hudspeth noted that Claimant appeared partially credible because she had a history of medically determinable

13

impairments, which could result in some limitations. (R. 588.) However, Dr. Hudspeth noted that Claimant's performance at her recent mental evaluation was significantly more limiting than medical records support, and the psychological consultative examination results were questionable. (R. 588.) Dr. Hudspeth indicated that Claimant had mild limitations restricting her daily living activities and mild difficulties in maintaining social functioning; she had moderate difficulties maintaining concentration, persistence, or pace and no episodes of decompensation. (R. 586.)

On the Mental RFC Assessment, Dr. Hudspeth indicated that Claimant was moderately limited in her ability to work in coordination with or proximity to others without being distracted by them, in her ability to accept instructions and respond appropriately to criticism from supervisors, and in her ability to get along with coworkers or peers without distracting them or exhibiting behavior extremes. (R. 591.) Dr. Hudspeth opined that the medical evidence of record indicated that Claimant had intact cognition/memory and thought processing skills sufficient for multiple step simple tasks, within any limitations from physical findings. (R. 592.) In addition, there was no medical evidence of record documenting any significant social or behavioral impediment to the work environment or any significant problems learning a route to a work site. (*Id.*) Dr. Hudspeth concluded that Claimant would be best served by having low pressure work assignments, due to a lack of work experience. (*Id.*)

On August, 13, 2012, Claimant was examined by clinical psychologist Dr. Michael E. Stone, a consultative examiner. (R. 759-63.) She arrived at the evaluation unaccompanied. (R. 760.) She had difficulty ambulating and required the assistance of a cane. (*Id.*) She was cooperative during the interview and was able to remember a

14

good degree of her past history. (*Id.*) She was well dressed, well groomed, and had good hygiene. (*Id.*) She was alert and oriented to time, place, person, and situation. (R. 761.) Her affect was depressed and anxious but appropriate to content; her mood was dysthymic and dysphoric. (*Id.*) Claimant's thought content was positive for depression and anxiety. (*Id.*) She exhibited problems maintaining a consistent level of attention and concentration throughout the evaluation. (*Id.*) She could repeat five digits forward and four digits backward; correctly identify her birth date and address; and immediately repeat three objects in one minute and three minutes, but not five minutes. (*Id.*) Simple calculations were difficult for Claimant to manage. (*Id.*) She was able to correctly identify the U.S. President and Chicago Mayor as well as four large cities in the United States; however, she was not able to identify four recent presidents. (R. 762.) She was able to relate that a shirt and hat are both clothing and an apple and banana are both fruit. (*Id.*) If she smelled smoke in a movie theatre she would pull the alarm, and if she found a stamped, addressed, envelope on the sidewalk she would leave it. (*Id.*) She had difficulty grasping the meaning of proverbs. (*Id.*)

Claimant was administered a Wechsler Adult Intelligence Scales IV. (R. 762.) Her verbal comprehension score of 74 and processing speed score of 76 resided in the borderline range. (R. 762-63.) Claimant's working memory score of 80 resided in the low average range. (R. 763.) She functioned in the borderline range of intelligence as measured by a full scale IQ score of 70, and resided in the Mild Mental Retardation range as measured by her perceptual reasoning score of 69. (R. 762.) Dr. Stone diagnosed Claimant with depressive disorder, learning disability, heroin abuse by history, borderline intellectual functioning, arthritis, and chronic pain. (R. 763.)

## 5. Function Reports

On April 4, 2011, Bernadine Dowdell, program director for Grace House, completed a third party function report on behalf of Claimant. (R. 349-56.) Claimant completed a function report on April 19, 2011, and her responses were virtually the same as Bernadine Dowdell's. (R. 366-73.) Ms. Dowdell stated that some days Claimant had less mobility than others. (R. 349.) She had painful episodes, difficulty standing over long periods, and difficulty with stairs. (*Id.*) Claimant's daily activities included participating in Grace House programs such as group counseling, life-skills classes, individual therapy, and parenting classes. (*Id.*) It was indicated that Claimant had back and leg pain, and she was not able to work, walk far, or stand for long periods. (R. 350, 354.) She also indicated that she was uncomfortable sleeping. (R. 350, 354.) The pain slowed her down; she had difficulty getting in and out of the bathtub and using low toilets, and her arm would give out if she picked up heavy pans or items. (R. 350.) She occasionally prepared her own meals, and it would take her approximately one hour to clean her bedroom. (*Id.*) She could travel by walking or using public transportation, and sometimes traveled with others because her legs locked. (R. 352.)

It was indicated that if she had money she would be able to budget and make sound decisions regarding her finances. (*Id.*) She occasionally would knit and sew every few weeks, but experienced limited hand movement because of the pins in her forearm. (R. 353.) She interacted socially with others by watching television and attending meetings. (*Id.*) On a regular basis she would go to the store, parks, or outings. (*Id.*) She indicated that her illnesses, injuries, or conditions affected her lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, using her hands, and completing

tasks. (R. 354.) She could walk thirty minutes before needing rest, and indicated that she could pay attention "very well." (*Id.*) She could finish her chores slowly, follow written and spoken instructions "very good," and was able to ask questions if she did not understand. (*Id.*) She got along "good" with authority figures and handled stress fairly well. (R. 355.) She feared that her physical condition would worsen. (*Id.*) She used a high seat on the toilet, a prescribed splint for her left wrist, glasses, and supportive shoes every day. (*Id.*) She took Naproxen, extra strength Tylenol, and vitamins. (R. 356. On July 28, 2011, Claimant completed another function report, and a subsequent third party report was completed by Cherie Mandeldoze. (R. 390-97, 399-406.) Responses from both reports were virtually the same or substantially similar as the previous functional reports.

### C.    Claimant's Testimony

#### 1.    June 21, 2012 Administrative Hearing

At the June 21, 2012 hearing, Hemphill testified that she was in a lot of pain because she ran out of her medication and it was going to rain. (R. 869-70). She had pain in her left leg, pelvis, and back. (R. 871.) When her pain was unbearable, she took more medication than prescribed. (R. 869.) She could not take narcotic pain and was prescribed Naproxen, Tylenol 500, and Tramadol. (R. 869, 874.) She tried different medications because some of the medications made her sick. (R. 870.) Due to a drug addiction, she went to prison for stealing. (*Id.*) She had not used drugs since 2007, and never used alcohol. (*Id.*) She attended AA meetings three to four times a week. (R. 874.)

Hemphill took depression medication every day. (R. 872.) She stated that she was crying and emotional because of her pain and the stress induced by the hearing. (R. 872-73.) The depression medication helped her sleep at night. (*Id.*) She usually used a cane to walk; however, during the hearing she used a walker provided by her nephew. (R. 871.)

## 2. January 9, 2013 Administrative Hearing

At the January 9, 2013 hearing, Hemphill testified that she was forty-seven years old and had hip problems since a 1991 car accident. (R. 58, 60, 64.) It always bothered her and became worse over time. (R. 58.) She could not read or write well. (R. 45.) She graduated from high school without the ability to read because she was in special education. (R. 96.) She stated that her sister goes over her mail and the administrator at Grace House filled out her disability application. (R. 45-46.) She was unable to use a computer and did not know how to check her email. (R. 46.)

Until May of 2012, she was a part-time French-fry cook at McDonald's. (R. 48.) She worked up to twenty hours per week for one year. (*Id.*) On slow days, she was sent home because she was unable to do other kinds of work. (*Id.*) She stopped working at McDonald's because she experienced leg pain while standing. (R. 49.) From 2005-2006, she worked part-time at a bookstore. (R. 50, 67.) She was taught how to ring things up, but she often helped customers find items in the store or assisted in the gift department. (R. 50.) She only earned approximately $1,100 in 2005 and the same amount in 2006. (R. 67.) When she was in both the Lincoln Custodial Services and Illinois Correctional Industries, she did janitorial and upholstery work. (R. 51.)

Claimant stated that she had trouble sleeping because of her pain and depression. (R. 54.) She slept about three hours per day and was unable to sleep during the night. (R. 55.) She was unable to personally care for her hygiene. (*Id.*) Because of her leg pain, her sister assisted her with showering, lifting, and chores. (R. 55-56.) Both her sister and a friend cooked her meals, washed her dishes, and made her bed. (*Id.*) She stated her leg popped and it bothered her to stand. (R. 56.) She could only walk a short distance before tiring from her back pain. (*Id.*) She attended church regularly, sometimes watching it on television, and attended AA meetings three times per week. (R. 56-57.) She had been clean for almost six years. (R. 57.) Her sister or friend went with her to medical appointments. (R. 58.)

The pain was the worst in her knees and back. (R. 58-59.) She also had hip problems. (R. 59.) The pain medication did not help, but the depression medication kept her balanced. (R. 58-59.) She was going to attend physical therapy for her back and leg pain. (R. 59, 61) She received injections in her knees, but they were not helpful. (R. 65-66). She used a cane for walking on the days her arthritis flared up, or on really cold days. (R. 60.) Some days she could not get out of bed because of her arthritis pain. (R. 61.) She was most comfortable lying down. (R. 59.) She had no suicidal thoughts, and liked being around other people. (R. 61-62.) She had trouble remembering things. (R. 62.) She talked to others such as her sponsor and housing specialist to avoid relapsing. (*Id.*) She saw a psychiatrist, and it had been helpful. (R. 64.)

### D. Medical Expert Testimony

#### 1. June 21, 2012 Administrative Hearing

At the June 21, 2012 hearing, Dr. David Biscardi, a licensed psychologist, testified that Claimant's Heartland records indicated she had a history of memory loss since March 8, 2011. (R. 875). However, at that time, her depression screening was negative. (*Id.*) Dr. Biscardi stated that Claimant's May 4, 2011 Psychological Consultative Evaluation was inconsistent with her past work history. (*Id.*) He noted that subsequent evidence dated July 22, 2011 indicated that Claimant was oriented times four, and described as cooperative with appropriate mood, affect and judgment. (R. 876.) He testified these findings were highly inconsistent with the data obtained two months earlier at the consultative examination. (R. 876.) Further, he stated that subsequent evidence dated February 15, 2012 and March 13, 2012 showed no depression, anxiety, or agitation. (*Id.*) He found this to be an obvious conflict in the evidence. (*Id.*) He testified that the record before him was insufficient because Claimant indicated that she was treated for mental impairments while incarcerated but the record did not contain that evidence. (R. 876-77.) He felt that an updated detailed mental status exam with I.Q. testing, along with the medical evidence during Claimant's incarceration, would shed some light on the ongoing severity. (*Id.*) The ALJ agreed and continued the hearing until a subsequent consultative examination with I.Q. testing could be completed. (R. 39, 867.)

### 2. January 9, 2013 Administrative Hearing

At the January 9, 2013 hearing, Dr. Hilda Klein Martin, testified that Claimant did not meet or equal a listing. (R. 81.) She stated that Claimant had chronic pain syndrome in her right leg and knee osteoarthritis with a medial meniscus complex tear to the left knee. (R. 72, 74.) She had mild tenderness, positive crepitus, and five out of five

strength bilaterally. (R. 74.) She had hip pain that prevented her from raising her left leg out to the side, and she had limited range of motion in her right hip and back pain with lumbar spine flexion. (R. 74-75, 76, 78.) She had significantly reduced internal and external hip rotation and her x-rays revealed severe bilateral protrusion acetabuli. (R. 75.) She also had pelvic pain. (R. 76, 78.)

Dr. Klein stated that as a result of Claimant's medically determinable impairments, she was limited to lifting twenty pounds occasionally and ten pounds frequently. (R. 81.) She was limited to standing two hours, in thirty minute intervals, and walking or sitting six hours. (R. 81, 87.) She could not push and pull with her left lower extremity, and could not use ropes, ladders, or scaffolds. (R. 81.) She could not crawl and was limited to occasional stairs, stooping, crouching, and kneeling as well as frequent fingering and handling of the left upper extremity. (*Id.*) She was to avoid concentrated pulling, slippery or uneven surfaces, and unprotected heights. (R. 82.)

Dr. Klein stated that Claimant's hips would affect her standing and walking as she alleged. (R. 82.) She had some multilevel degenerative disc disease and mild degenerative facet arthropathy. (R. 83.) However, there was never any indication that she had a true radiculopathy. (*Id.*) Claimant was not overly obese and her weight would not have exacerbated her severe problems. (R. 89.)

### D.    Vocational Expert Testimony

At the January 9, 2013 administrative hearing, Vocational Expert ("VE") Lisa Gagliano testified that Claimant's past relevant work included sales clerk, housekeeping clerk, motor vehicle assembler, upholstery handler, and hand cutter. (R. 98.) Claimant performed all positions at the light exertional level and there were no transferrable skills

to sedentary work. (*Id.*) The ALJ asked the VE whether the following hypothetical of the same age, education and work experience as Claimant could perform any other work in the Chicago Metropolitan region, the state, or national economy. (*Id.*) The individual would be limited to an RFC with a sedentary exertional activity level, except that she could lift ten pounds frequently and twenty pounds occasionally; could not push or pull with the left side, but could from the right; and would be subject to limitations against any climbing of ladders, ropes, or scaffolds, and occasional stooping, crouching, or kneeling. (R. 98-99.) The individual would also be limited to frequent handling and fingering objects with the left hand; and must avoid slippery or uneven surfaces, concentrated exposure to cold and unprotected heights. (R. 98-99.) The individual would be prohibited from commercial driving and would be limited to simple routine and repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple work related decisions with few if any workplace changes. (R. 99.)

The VE responded that the hypothetical person could potentially work in a few simple assembly jobs. (*Id.*) She could work as a lamp shade assembler (40,000 nationally and 2,200 in Illinois), or as a visual inspector (30,000 nationally and 1,500 in Illinois). (R. 100.) Anything beyond those positions would require some higher level reasoning skills and the hypothetical person could not perform other sedentary jobs. (*Id.*) There would be minimal reading and the jobs have language skills with general educational development of one, the lowest level, with instructions given verbally, but commonly written. (*Id.*) The jobs could be performed by someone who did not speak English. (*Id.*) The assembly job was bench work and the visual inspector was both line

and bench work. (R. 100-101.) Individuals were expected to remain on task approximately ninety percent of the workday, and show up to work every day because being absent from work more than one day a month was not well tolerated. (R. 101-02.) Some of the jobs were self-paced work; however, there was a production expectation in most if not all production type facilities. (R. 104-05.)

Claimant's attorney then asked the VE how many assembly jobs would be available that included only bench work. (R. 103.) The VE responded that for the lamp shade assembler job or assembler jobs in general the number would be eroded by twenty five percent at the sedentary level. (*Id.*) For the visual inspector job, the number of jobs available would be eroded by fifty percent. (*Id.*)

## **LEGAL ANALYSIS**

### I.   **ANALYSIS UNDER THE SOCIAL SECURITY ACT**

Under the Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. (*Id.*) The claimant bears the burden of proof at steps 1–4. (*Id.*) Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. (*Id.*)

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872.) The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III. ALJ'S DECISION

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset date of June 1, 1991. (R. 15.) At step two, the ALJ concluded that Claimant had severe impairments of chronic pain syndrome, bilateral

knee osteoarthritis, bilateral hip pain, left arm pain, back pain, depression, learning disorder, non-severe obesity, and a substance use disorder that was in remission. (R. 15-16.) At step three, the ALJ concluded that the impairments, alone or in combination, do not meet or medically equal the severity of any of the listed impairments. (R. 16.) The ALJ then determined that Claimant retained the RFC to perform sedentary work except that she can never push or pull with the left arm; can never climb ladders, ropes, or scaffolds or crawl; can occasionally climb stairs, stoop, crouch, or kneel; can frequently handle objects and frequently finger with the left hand; must avoid concentrated exposure to extreme cold; avoid all exposure to unprotected heights, slippery, or uneven surfaces or commercial driving; and is limited to simple, routine and repetitive tasks, performed in a work environment free of fast paced production requirements, involving only simple, work-related decisions with few, if any, workplace changes, and no tandem tasks. (R. 19.) At step four, the ALJ concluded that Claimant could not perform any of her past relevant work. (R. 27.) At step five, based upon the VE's testimony and Claimant's age, education, work experience, and RFC, the ALJ concluded that Claimant could perform jobs existing in significant numbers in the national economy, leading to a finding that she was not disabled under the Act. (R. 28-29.)

## IV.   ANALYSIS

Claimant now argues that the ALJ's decision was in error because: (1) the ALJ failed to account for all of her mental limitations in his RFC Assessment; (2) the ALJ did not properly weigh the opinions of the medical sources; and (3) the ALJ's credibility determination was not supported by substantial evidence.  As discussed in further detail

below, we agree that Claimant's mental limitations were not properly accounted for in the ALJ's RFC Assessment and that the ALJ did not properly weigh the opinions of the medical sources.

### A.   Mental Limitations: Concentration, Persistence, and Pace

Claimant assigns error to the ALJ's failure to include all of the relevant evidence in the record in making his RFC assessment and in his hypothetical posed to the VE. Specifically, Claimant contends that her moderate difficulties in accepting instructions, maintaining concentration, performing activities within a schedule, and being punctual within usual customary tolerances amount to difficulties related to concentration, persistence, and pace, which should have been included in the hypothetical posed to the VE.  Relying on *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), Claimant further contends that difficulties in concentration, persistence, and pace are not accounted for by a restriction to simple, repetitive work.  Claimant also argues that while the ALJ relied on portions of Dr. Stone's report, he ignored other parts and did not explain how Claimant's inabilities allowed her to perform assembly or inspection jobs on a full time basis.[2]

Defendant responds that the ALJ adequately assessed Claimant's mental limitations and properly accounted for those limitations in his RFC assessment and hypothetical posed to the VE.  Defendant distinguishes *O'Connor-Spinner*, arguing that the controlling hypothetical question in this case accurately tracked the ALJ's RFC assessment. (*Id.*) Defendant also argues that Drs. Hudspeth and Voss's indication that

---

[2] In her reply, Claimant argues, for the first time, that she meets Listing 12.05C. However, "[I]t is well-established that arguments raised for the first time in a reply brief are waived." *Shlay v. Montgomery*, 802 F.2d 918, 922 n.2 (7th Cir. 1986); *see Bodenstab v. County of Cook*, 569 F.3d 651, 658 (2009).

Claimant had moderate difficulties in accepting instructions, performing work activities within a schedule, and being punctual within usual customary tolerances applied to the "psychiatric review technique" at the third step, and as such were not synonymous with the ALJ's assessment of Claimant's RFC in the fourth and fifth step. In addition, Defendant argues even if *O'Connor-Spinner* were controlling, reversal would not be warranted because the Seventh Circuit explained that there was no "per se requirement that this specific terminology ('concentration, persistence, and pace') be used in the hypothetical in all cases." (Def.'s Resp. at 6. (*citing O'Connor-Spinner*, 627 F.3d at 619.))

The Psychiatric Review Technique described in 20 CFR 404.1520a and 416.920a and summarized on the PRTF requires adjudicators to assess an individual's limitations and restrictions from mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. SSR 96-8p. The Mental RFC Assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF. (*Id.*)

In this case, in evaluating steps two and three the ALJ found that Claimant had moderate restrictions in her activities of daily living. (R. 17.) The ALJ also found that Claimant had moderate limitations in regards to concentration, persistence, or pace. (R.

18.) These findings were indicated on Mental RFC Assessments completed by Drs. Voss and Hudspeth, which are used at steps four and five to evaluate a claimant's RFC; they were not indicated on PRTFs. (R. 117-19, 590-92.)

As such, the ALJ was required to include all of Claimant's limitations in his RFC assessment and hypothetical posed to the VE. This would have allowed the VE to appropriately eliminate any positions that the Claimant was incapable of performing. The ALJ failed in this regard because he asked the VE about a hypothetical person that "would be limited to simple routine and repetitive tasks performed in a work environment free of fast paced production requirements, involving only simple work related decisions with few if any workplace changes." (R. 98.) *See O'Connor-Spinner v. Astrue*, 627 F.3d at 620 (explaining that "terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace"); *see also Gamble v. Comm'r of Soc. Sec.*, No. 1:14-CV-00239-SLC, 2015 WL 5730703, at *9 (N.D. Ind. Sept. 30, 2015) (*citing Warren v. Colvin,* 565 F. App'x 540, 544 (7th Cir. 2014) (finding that a limitation to "simple, repetitive tasks" did not adequately account for the claimant's concentration problems arising from depression and borderline intellectual functioning)). Therefore, the Court finds that the ALJ erred in his RFC assessment and should have included all of Claimant's limitations in his hypothetical posed to the VE. On remand, the ALJ should more completely discuss Claimant's limitations on concentration, persistence, and pace as they relate to her ability to remain on task for jobs at all levels.

In addition, the ALJ repeatedly states that Claimant successfully maintained employment at McDonald's after her release from prison, which would run counter to

her reported limitations. (R. 17-18.) "[T]he fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation." *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003). Here, it was noted that upon Claimant's release from prison she was homeless and worked as part of her requirements for residing and participating in activities at the Grace House. A reasonable mind could conclude that she worked on a part-time basis beyond her capacity, out of desperation.

### B. Weight of Medical Opinions

Claimant argues that the ALJ improperly weighed the opinions of the medical sources. Claimant contends that the ALJ failed to explain what weight, if any, he assigned to the opinions of the consultative examiners Drs. Kieffer and Stone. Claimant further contends that the ALJ improperly afforded greater weight to the evaluation conducted by Nurse Brennan in March 2012, than the CE conducted by Dr. Kieffer.

Defendant argues that an ALJ should generally give more weight to well-supported opinions that are not inconsistent with the record. Defendant further contends that the ALJ did not ignore Dr. Kieffer's opinion; he just did not rely on it and provided sufficient reasons for not doing so. Defendant also argues that while a nurse practitioner is not an "acceptable medical source," pursuant to SSR 06-03p, a nurse practitioner is considered an "other medical source," and in this instance treatment notes from the nurse were properly used as evidence of Claimant's level of functioning.

An ALJ is not required to address every piece of evidence or testimony in the record. *Walters v. Astrue*, 444 F. App'x 913, 917 (7th Cir. 2011) *citing Schmidt v. Barnhart,* 395 F.3d 737, 744 (7th Cir. 2005). Nevertheless, a medical opinion from an

examining consultative psychologist is not just another piece of evidence. *See McKinzey v. Astrue,* 641 F.3d 884, 891 (7th Cir. 2011). The SSA's own regulations provide that ALJs "may not ignore these opinions and must explain the weight given to these opinions in their decisions." SSR 96–6p; *McKinzey,* 641 F.3d at 891.

The Court finds that the ALJ failed to explain what weight, if any, he gave to the opinions of consultative examiners Drs. Kieffer and Stone. The ALJ acknowledged Drs. Kieffer and Stone's consultative mental examinations; but when it came to assigning weight to the medical opinions, he weighed only the testimonies of Drs. Biscardi and Martin, and the opinions of non-examining physicians Drs. Madison and Hudspeth. Even if the ALJ found the opinions of Drs. Kieffer and Stone's irrelevant and/or of minimal value, or outright rejected the opinions, he was required to explain his reasoning and offer substantial evidence supporting his decision, not just the contradictory testimonies and opinions of Drs. Biscardi, Martin, Hudspeth, and Madison. *See Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003) ("An administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.")

In addition, SSR 96-03p provides that there is a distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources". SSR 96-03p. The SSA needs evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. (*Id.*) Only "acceptable medical sources" can be considered treating sources, whose medical opinions may be entitled to controlling weight. (*Id.*) In addition to evidence from

"acceptable medical sources," the SSA may use evidence from "other sources," to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. (*Id.*) Nurse practitioners are "other sources," not "acceptable medical sources," and therefore, not a treating source. (*Id.*) *See Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010) (finding that a nurse-practitioner is not a "treating source"). As such, the ALJ may use the evidence from Nurse Brennan's March 13, 2012 examination as evidence to show the severity of the Claimant's impairment(s) and how it affects her ability to function, but not as evidence of Claimant's mental depression diagnosis or lack thereof. (*Id.*)

The Court finds that the ALJ improperly found that Nurse Brennan was a "treating source" and therefore, erroneously accorded greater weight to the nurse's opinion over that of Dr. Kieffer's. Here, the ALJ opined that Claimant's March 13, 2012 examination showed an intact mental status, along with judgement and memory, and did not reveal depression at that time, nor was anxiety/agitation revealed; although, Dr. Kieffer's May 2011 psychological examination was in conflict. (R. 29.) The ALJ concluded that "[t]he evaluation from March 2012 was from a treating source and I accord it greater weight because it addressed all of the claimant's alleged impairments." (*Id.*) Therefore, because the ALJ admittedly gave controlling weight to an "other source" over that of an "acceptable medical source" in establishing whether or not Claimant was depressed, he did so in error.

### C.    Credibility

Claimant argues that the ALJ's credibility determination was not supported by substantial evidence as it was based on a factually and legally flawed analysis.

According to Claimant, her symptoms of pain were substantiated by objective medical evidence, despite the ALJ finding otherwise. In addition, Claimant contends that her testimony supports the difficulties she had with even part-time work, and again reiterates that she was required to work as a condition of residing at Grace House.

Defendant responds that the ALJ detailed Claimant's treatment history, including numerous admissions that the medication controlled her pain and that the pain did not affect her functioning. In addition, the defendant points to six independent reasons provided by the ALJ for discounting Claimant's allegations. Defendant further contends that the ALJ's consideration of Claimant's part-time job at McDonald's was not in error because it showed evidence that Claimant's pain was not as severe as alleged.

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that in assessing the credibility finding, courts do not review the medical evidence *de novo* but "merely examine whether the ALJ's determination was reasoned and supported"). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88); *see* SSR 96-7p.

The lack of objective evidence is not by itself reason to find a claimant's testimony to be incredible. *See Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005). When evaluating a Claimant's credibility, the ALJ must also consider "(1) the claimant's daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." *See Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *see* SSR 96-7p at *3. When the claimant attends an administrative hearing, the ALJ "may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." SSR 96-7p at *5.

As previously discussed, Claimant's working part-time at McDonald's does not show her capacity; nor does it have bearing on her credibility, especially since the medical evidence of record reflects that she frequently complained of pain while working. The Court finds that although the ALJ erred in assessing Claimant's credibility regarding Claimant's working at McDonald's, the error was harmless because the ALJ supported his credibility finding with numerous other independent reasons that were supported by substantial evidence. The fact that another adjudicator may have come to a different conclusion based on the record is not a sufficient basis to overturn the ALJ's credibility determination. Claimant has not shown that the ALJ was unreasonable in giving greater weight to the medical evidence, which failed to support her objective complaints of pain, than it did to her testimony. The ALJ's credibility finding was specific, it was not patently wrong, and it will not be disturbed by this Court. In any event, since

this matter is remanded for other reasons set forth above, the ALJ is instructed to re-evaluate Claimant's credibility.

## CONCLUSION

For the foregoing reasons, Claimant Hemphill's motion for summary judgment [17] is granted and the Commissioner's cross-motion for summary judgment is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this Order.

ENTERED:

**Michael T. Mason**
**United States Magistrate Judge**

Dated: December 23, 2015